# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

UNITED STATES OF AMERICA,

        **Plaintiff**

-vs-                                        **Case No. 2:10-cr-42-FtM-29DNF**

JOHN MICHAEL STOKES, JR.,

        **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration on the Defendant, John Michael Stokes, Jr.'s Motion to Suppress Evidence and Statements Obtained from an Illegal Search and Seizure (Doc. 24) filed on July 23, 2010. The Defendant is requesting that the Court suppress evidence and statements from a vehicle stop. On August 16, 2010, the Government filed a Response to Motion to Suppress Evidence and Statements (Doc. 29) and the Government filed a Supplemental Argument and Authority on Motion to Suppress Evidence and Statements (Doc. 44) on October 14, 2010. The Defendant is charged in an Indictment (Doc. 1) with being a felon in possession of a firearm in violation of 18 U.S.C. §922(g)(1).

### I. Evidence

The Government presented the testimony of the following officers from the Florida Highway Patrol: Trooper Adam Heinlein, Trooper Christopher Adkinson, and Trooper Michael Grider. The Government introduced into evidence the Witness Interview of a statement written and signed by the

Defendant dated January 22, 2010 (Gov. Exh. 1).  The Defendant did not present any witnesses or evidence.

### A. Testimony of Trooper Heinlein

Trooper Heinlein is on the contraband interdiction team with the Florida Highway Patrol. (Tr[1]. p. 4).   On January 22, 2010 at approximately 6:33 p.m., he was stationed on SR 93 in Charlotte County, Florida in the median. (Tr. p. 8, 10).  He saw a green BMW pass in front of his patrol car's headlights. (Tr. p. 8-9).   Trooper Heinlein saw that the tint on the windows of the BMW was extremely dark. (Tr. p. 9).   Trooper Heinlein pulled out into traffic following the BMW and he saw the BMW change to the right lane and then it proceeded to run off the roadway several times and once it went onto the grass area off the road.  (Tr. p. 11-12).  As Trooper Heinlein approached the vehicle, he realized that the license plate was obstructed and he was not able to determine the state on the license plate. (Tr. p. 13, 14).   Trooper Heinlein activated his emergency equipment and made a traffic stop. (Tr. p. 15).   He based the traffic stop on the darkness of the window tint, failure to drive within a lane, and lack of visibility of the license plate. (Tr. p. 15).

Trooper Heinlein asked the driver of the vehicle to step out of the vehicle. (Tr. p. 16). There was also a passenger in the vehicle.  (Tr. p. 17).   The driver, later identified as John Michael Stokes, Jr., stepped out of the vehicle. (Tr. p. 16, 17).   Trooper Heinlein walked within three feet of the license plate to determine that the state on the plate was Missouri. (Tr. p. 16).   Trooper Heinlein asked the Defendant to walk back to Trooper Heinlein's vehicle where he explained the three violations. (Tr. p. 19).   The Defendant told Trooper Heinlein that he did not know his tint was not legal, he agreed

---

[1]  "Tr." refers to the Transcript (Doc. 46) filed on October 18, 2010, of the evidentiary hearing held on October 8, 2010.

to remove the custom frame from the license, and he did not realize he was swerving.  (Tr. p. 22-23). As Trooper Heinlein spoke to the Defendant, the Defendant's carotid artery was beating very fast and the Defendant looked nervous.  (Tr. p. 19, 21).

Trooper Heinlein tested the tint on the passenger front window and it read 14%.  (Tr. p. 21). He asked the Defendant where he was heading, and the Defendant responded Riverview, Florida.  (Tr. p. 22).  The Defendant said he had moved back to Florida about a month ago.  (Tr. p. 22). The Defendant became increasingly nervous, stuttered, and could not stand still.  (Tr. p. 23).  Trooper Heinlein asked the Defendant for his driver's license, and the Defendant produced it.  (Tr. p. 23). When Trooper Heinlein asked to see the vehicle registration, the Defendant indicated it was in the glove box in the vehicle. (Tr. p. 23).

Trooper Heinlein went to the vehicle, and asked the passenger in the vehicle for the registration. (Tr. p. 24).  The passenger gave Trooper Heinlein the registration.  (Tr. p. 24).  He asked the passenger her name, for identification, and where they were traveling. (Tr. p. 24).  The passenger appeared nervous and her hands shook as she handed her driver's license to Trooper Heinlein.  (Tr. p. 24).

At approximately 6:36 p.m., Trooper Heinlein called into dispatch for a records check on both the Defendant and the passenger. (Tr. p. 25).  He asked dispatch to run the license plate number and to run a check on the driver's licenses. (Tr. p. 25).  Trooper Adkinson arrived in a separate patrol car around this time.  (Tr. p. 27).  Trooper Adkinson's patrol car indicated it was a K-9 unit, however, there were no dogs in the vehicle that night. (Tr. p. 28).  When the Defendant saw Trooper Adkinson's vehicle, he became even more nervous. (Tr. p. 28).  It took dispatch a few minutes to relay the

information by radio on the checks back to Trooper Heinlein. (Tr. p. 25).  Trooper Heinlein learned

that the Defendant had an extremely lengthy criminal history and was a convicted felon. (Tr. p. 26).

As Trooper Heinlein was handing the Defendant the licenses and registration, he asked the

Defendant if he had any illegal drugs, large amounts of U.S. currency, or weapons in the vehicle. (Tr.

p. 28).  The Defendant responded he did not.  (Tr. p. 28).  Trooper Heinlein asked the Defendant if he

could search his vehicle.  (Tr. p. 29).  The Defendant responded yes. (Tr. p. 29).  Trooper Heinlein

asked the passenger to exit the vehicle. (Tr. p. 30).   Again, Trooper Heinlein asked the Defendant if

he could search the entire vehicle, and the Defendant again responded yes. (Tr. p. 30).  The Defendant

did not limit the scope of the search in any way.  (Tr. p. 30).  Trooper Heinlein believed that because

he asked the Defendant if there were any illegal drugs, U.S. currency, or weapons in the vehicle, that

the scope of the search was anything that could hold these objects.  (Tr. p. 31).

Trooper Heinlein began to search the vehicle. (Tr. p. 31).  He found nothing in the interior of

the vehicle. (Tr. p. 31).  He opened the trunk of the vehicle.  (Tr. p. 32-33).  The Defendant was able

to watch the search as it progressed and did not limit the search of the trunk. (Tr. p. 33).   Inside the

trunk, Trooper Heinlein saw two duffle bags and a black box. (Tr. p. 33).  He held up one duffle bag

and asked whose it was. (Tr. p. 33).   The passenger said it was hers. (Tr. p. 33).   Trooper Heinlein

asked if he could search the duffle bag, and the passenger said yes. (Tr. p. 33).  He repeated the same

procedure with the second duffle bag. (Tr. p. 33).  Trooper Heinlein held up the black box and asked

whose it was. (Tr. p. 33-34).  The Defendant stated that the black box was his. (Tr. p. 34).   Trooper

Heinlein asked if he could search the black box and the Defendant said yes.  (Tr. p. 34).   There were

two latches on the black box and Trooper Heinlein pushed them up to open the box. (Tr. p. 34).  He

asked if the Defendant knew what was in the black box, and the Defendant said no. (Tr. p. 35).

Trooper Heinlein saw a Sig firearm semi-automatic in plain view, and 9 rounds of fragmenting high-shock ammunition in the black box. (Tr. p. 35, 71).   At 6:57 P.m. Trooper Adkinson called dispatch about the firearm.

At the hearing, Trooper Heinlein was asked, "All right. did you ask any questions of Mr. Stokes concerning the firearm that you had just found?" (Tr. p. 35).   Trooper Heinlein responded, "He said it wasn't his." (Tr. p. 35).   Trooper Heinlein later testified, " originally when I found the firearm, I asked him if it was his and he said no, it wasn't."  (Tr. p. 47, 66).  Trooper Heinlein testified that maybe ten to fifteen seconds after finding the gun he asked the Defendant if it was his gun, and the Defendant said it was not.  (Tr. p. 71).  On cross-examination, Trooper Heinlein testified as follows:

> A.    When I found the firearm, he [the Defendant] was not secured into handcuffs at that time.  When I found the firearm, he denied knowledge of the firearm at that point.   When I talked to Ms. Smith [the passenger], she said the firearm was his.  At that point I secured him into handcuffs.
>
> Q.    At that point he was under arrest?
>
> A.    He was secured into handcuffs at that time because he hadn't been patted down at that time, so we didn't know if he had any other weapons or anything of that matter on him.

(Tr. p. 64-65). After finding the firearm, but before asking any questions about the firearm, the Defendant was not placed in handcuffs and was not told he was not free to leave.  (Tr. p. 69-70).

Trooper Heinlein moved the passenger to a separate area and asked about the firearm. (Tr. p. 35). The passenger said that the firearm belonged to the Defendant. (Tr. p. 36, 71).  Trooper Heinlein directed Trooper Adkinson to place the Defendant in handcuffs.  (Tr. p. 36).   Trooper Heinlein believed that the Defendant had violated the law by being a felon in possession of a firearm. (Tr. p. 36).  Trooper Heinlein secured the firearm, removed the ammunition, and locked the firearm and

ammunition in the trunk of his patrol car. (Tr. p. 36).   As Trooper Heinlein was speaking to the passenger, the Defendant called out to him and said that the firearm was his and he could not let his girlfriend take the rap. (Tr. p. 36-37, 47).   He said that the firearm was stolen and was used for protection only.  (Tr. p. 37). The Defendant then started telling Trooper Heinlein that he could get him drugs or weapons if he wanted.  (Tr. p. 37, 47).

Trooper Heinlein asked the Defendant to stop talking and read him his *Miranda* rights from a card.  (Tr. p. 37).   Trooper Heinlein asked the Defendant if he understood each of his rights and the Defendant responded yes.  (Tr. p. 38).   Trooper Heinlein testified that approximately eight minutes passed from the time of the stop to the time that the Defendant gave his consent to search the vehicle. (Tr. p. 39). Trooper Heinlein testified that it was approximately twenty-one minutes from the time of the stop to Trooper Adkinson's call into dispatch about the firearm. (Tr. p. 70).

After the *Miranda* warnings were given, the Defendant told Trooper Heinlein that if he would stay out of jail, he would provide information on stolen firearms and running crystal meth. (Tr. p. 40).  The Defendant said that he bought the firearm on the street from a guy who said it was stolen. (Tr. p. 41).   Trooper Heinlein told the Defendant that no matter what he did, the Defendant was going to jail that night. (Tr. p. 41-42).   The Defendant was taken to the Florida Highway Patrol Office in Lee County, Florida.  (Tr. p. 42).   Trooper Heinlein did not hear Trooper Adkinson or Trooper Grider ever make any promises to the Defendant.  (Tr. p. 43).

The Defendant made written a statement dated January 22, 2010.  (Gov. Exh. 1, Tr. p. 43-44). Trooper Heinlein did not tell the Defendant that if he made a statement he would receive a reduced sentence. (Tr. p. 46).   Trooper Heinlein told the Defendant that federal agents would meet him at the

station and the decision was for the federal agents. (Tr. p. 46).   As they drove to the Florida Highway Patrol Office, the Defendant said that he ran methamphetamines and other illegal drugs.  (Tr. p. 48).

On cross-examination, Trooper Heinlein testified that it is normal to be nervous when pulled over by officers. (Tr. p. 56). Also it was cold that night, the Defendant was not wearing a jacket, and the Defendant was shivering from the cold. (Tr. p. 56-57).  The Defendant was cooperative.  (Tr. p. 57). Trooper Heinlein told the Defendant he intended on giving him a warning for the tint, license plate, and swerving violations, and did give him either a verbal or written warning, Trooper Heinlein could not remember which he did. (Tr. p. 57).

### B.   Testimony of Trooper Adkinson

Trooper Adkinson is a K-9 handler and is in training. (Tr. p. 73).   On January 22, 2010, he was working on the interdiction team in a marked patrol car. (Tr. p. 73).  He was conducting routine patrol and was working with Trooper Heinlein.  (Tr. p. 73-74).   He saw Trooper Heinlein pull a green BMW over to the shoulder of the interstate to conduct a traffic stop. (Tr. p. 75).   He went to assist Trooper Heinlein as backup. (Tr. p. 76).  He heard on the radio all of the information that Trooper Heinlein received when the driver's licenses were called into dispatch. (Tr. p. 76).  When he reached the traffic stop, Trooper Heinlein was explaining the violations to the Defendant. (Tr. p. 77).  When Trooper Heinlein was handing the identification documents back to the Defendant, he asked if the Defendant had any illegal drugs, money, or weapons in the vehicle and the Defendant said no. (Tr. p. 78). Trooper Heinlein then asked the Defendant for consent to search the vehicle, and the Defendant said yes. (Tr. p. 78).   After the Defendant gave his consent to search the vehicle, Trooper Heinlein asked the passenger to exit the vehicle which she did. (Tr. p. 78-79).   He again asked the Defendant if he

could search the vehicle and the Defendant said, "Sure. Go ahead, no problem." (Tr. p. 79).  After searching the interior of the vehicle, Trooper Heinlein asked the Defendant if he could search the trunk. (Tr. p. 79). As Trooper Heinlein pulled a bag out of the trunk he asked whose bag it was, and then asked if he could search it, and the passenger said, "Yes." (Tr. p. 79).   When Trooper Heinlein pulled the black box out of the trunk, he asked whose it was, and the Defendant replied it was his. (Tr. p. 79).   Trooper Heinlein asked if he could search it and the Defendant said, "Sure. Go ahead and search the – you can search that."  (Tr. p. 79).   When Trooper Heinlein opened the black box, he located a firearm.  (Tr. p. 80). The black box had two latches, and was not locked.  (Tr. p. 83, 84). Trooper Heinlein opened it without using force.  (Tr. p. 83, 84).   Both Trooper Heinlein and Trooper Adkinson knew the Defendant was a convicted felon when the black box was opened. (Tr. p. 80, 84-85).  When Trooper Heinlein found the firearm, he asked whose firearm it was and the Defendant stated that he did not know it was there.  (Tr. p. 80).  Trooper Heinlein separated the passenger, and the passenger said the weapon belonged to the Defendant. (Tr. p. 80).  The Defendant called out to Trooper Heinlein, admitted the gun was his and it was stolen,  and the Defendant said he did not want the passenger to go to jail. (Tr. p. 81). The Defendant was handcuffed after he admitted the gun was his.  (Tr. p. 80).  The Defendant's statement was spontaneous and not in response to any questioning. (Tr. p. 81).  The Defendant then began to rant about his criminal activities until Trooper Heinlein stopped him. (Tr. p. 81).  Trooper Heinlein read the Defendant his *Miranda* rights, and the Defendant stated he understood them. (Tr. p. 81-82).  Trooper Heinlein asked the Defendant to write a statement which he did.  (Tr. p. 82). Trooper Adkinson called into dispatch about the gun at 6:57 p.m. and dispatch advised him that the firearm was stolen.  (Tr. p. 83).  Neither he nor Trooper Heinlein ever made any promises to the Defendant.  (Tr. p. 93).

On cross-examination, Trooper Adkinson testified that the Defendant was very nervous when Trooper Adkinson arrived on the scene. (Tr. p. 89). When he arrived at the scene, Trooper Heinlein was in the process of handing back the identification documents to the Defendant and asking the Defendant if there were any illegal drugs, U.S. currency or weapons in the vehicle.(Tr. p. 90).

### C.  Testimony of Trooper Grider

Trooper Grider is a K-9 handler. (Tr. p. 95). On January 22, 2010, Trooper Heinlein had called on Nextel for Trooper Grider's assistance, and  he went to the scene of the traffic stop.  (Tr. p. 95). When he arrived at the scene, Trooper Heinlein explained the situation and asked Trooper Grider's advice about whether the information received from the Defendant should be passed on. (Tr. p. 96). Trooper Grider had a conversation with the Defendant about firearms and drugs and how the Defendant could obtain them.  (Tr. p. 97).  The Defendant wanted to help himself, and he wanted to be released to take Trooper Grider to do a buy.  (Tr. p. 97).   Trooper Grider told the Defendant that he would be going to jail that night, but that officers in a higher position would be making the determinations regarding the information he provided. (Tr. p. 97).  He made no promises to the Defendant.  (Tr. p. 97).

### II.  Analysis

The Defendant asserts that the stop of the vehicle was a pretext, the length of the stop was excessive,  the search exceeded the scope of the consent, the officer forced the latch on the black box exceeding the scope of the consent, no probable cause existed to arrest the Defendant, and the officers made promises to the Defendant that he would be released if he cooperated.  At the hearing, an

additional issue was raised regarding whether the Defendant's constitutional rights were violated when Trooper Heinlein asked who was the owner of the weapon found in the trunk.   The Government asserts that the stop was lawful, and that none of the statements or evidence seized should be suppressed.

### A.  Stop

Trooper Heinlein testified that he stopped the Defendant's vehicle for a window tint violation, a license tag violation, and for swerving.  The Fourth Amendment provides protections to individuals from unreasonable searches and seizures by government officials, and this protection extends to investigatory stops of people or vehicles. *United States v. Johnson*, 192 Fed.Appx. 935, 938 (11th Cir. 2006), (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).   A stop of an automobile by police, even if only for a brief period of time and for a limited purpose constitutes a "seizure" of  "persons" within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-810 (1996), citations omitted.  A traffic stop must not be "unreasonable" under the circumstances.  *Id*. at 810. A decision to stop a vehicle is reasonable when the officer has probable cause to believe a traffic violation occurred.  *Id*., *See Also*, *United States v. Johnson*, 307 Fed.Appx. 372, 373-4(11th Cir. 2009).

In the instant case, Trooper Heinlein stopped the vehicle for a window tint violation, a license tag violation, and for swerving.   Trooper Heinlein observed the green BMW and determined from his experience that the window tinting violated the law.  After Trooper Heinlein stopped the vehicle, he used a tint meter and found that the light transmittance was 14% for the side passenger window. Pursuant to Fla. Stat. §316.2953, a side window must have a light transmittance of "at least 28% in the visible light range."  The Court determines that Trooper Heinlein had probable cause to stop the vehicle for a violation of the window tint statute.

Trooper Heinlein also observed that he was unable to determine the state on the license plate due to the frame obscuring the state's name.  Pursuant to Fla. Stat. §316.605, a license plate must be affixed to a vehicle and "all letter, numerals, printing, writing, and other identification marks upon the plates" must be legible at 100 feet from the rear of the vehicle.  This statute includes license plates from states outside of Florida.  Fla. Stat. §316.605.  Trooper Heinlein testified that he had to walk up to the license plate to determine that it was from Missouri.  Therefore, Trooper Heinlein had probable cause to stop the vehicle concerning the obscured license plate.

Trooper Heinlein observed the vehicle swerving outside of its lane and going onto the shoulder and the grassy portion of the shoulder of the road. Pursuant to Fla. Stat. §316.089,

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in addition to all others consistent herewith, shall apply:
> (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

Trooper Heinlein observed the green BMW swerving in and out of its lane and onto the grassy shoulder of the road.  Trooper Heinlein has probable cause to stop the vehicle for a violation of Fla. Stat. §316.089.  Therefore, the Court finds that the stopping of the vehicle was legal.

**B. Length of Stop**

The Defendant asserts that he was illegally detained beyond the time that was necessary to complete the stop and issue the warning citation.  The length of a traffic stop must be "'reasonably related in scope to the circumstances which justified the interference in the first place.'"  *United States v. Frazier*, 194 Fed. Appx. 694, 700 (11th Cir. 2006) (citing *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003)).  A stop must be of a limited duration and cannot last "'any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity.'"

*Id*. (quoting *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001)).  The length of the stop is limited to the time necessary to effectuate the purpose of the stop, however, an officer does have an affirmative duty to investigate suspicious circumstances.  *Id*. (citing *Purcell*, 236 F.3d at 1277) and *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991)).  In addition, officers are permitted to conduct a variety of checks on the driver and his car which include questioning the driver about the traffic violation, requesting the driver to consent to a search of the car, and running a computer check on the driver for outstanding warrants.  *Id*. (citing *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999) and *Purcell*, 236 F.3d at 1278)).

An officer is permitted to ask a driver if he consents to a search of the vehicle.  *United States v. Gonzalez*, 275 Fed.Appx. 930, 933 (11th Cir. 2008).  "When the driver voluntarily consents to a search of his vehicle, 'the remainder of the detention [is] consensual so long as the scope of the search [does] not exceed the consent given.'"  *Id*. (quoting *Purcell*, 236 F.3d at 1279 n. 8).  "Thus where the driver raises no issue concerning the scope or duration of the search, only the time period between the initial stop and the driver's consent is relevant to the reasonableness of the duration of the traffic stop."  *Id*. (citing *Purcell*, 236 F.3d at 1279, and *United States v. Hernandez*, 418 F.3d 1206, 1209-10 (11th Cir. 2005)).

In the instant case, the stop occurred a few minutes after 6:30 p.m..  Trooper Heinlein asked the driver to exit his vehicle, walked up the license plate to determine the state, and explained to the driver the reason for the stop.  Trooper Heinlein obtained identifying information from the driver and passenger. At 6:36 p.m. Trooper Heinlein called into dispatch for a records check of the driver and passenger, and a records check of the vehicle.  When the records check was completed, as Trooper Heinlein was handing back the identification documents he asked the Defendant is there were any

illegal drugs, weapons, or U.S. currency in the vehicle.  After the Defendant responded, Trooper Heinlein asked if he could search the vehicle.  The Court must determine if the stop lasted longer than the duration to process the traffic stop.  In the instant case it did not.  Trooper Heinlein completed the traffic stop and as he was handing back the identification documents he asked one question, and then obtained the Defendant's consent.  The Court finds that the duration of the stop from the time of the stop until the Defendant provided consent to search the vehicle was lawful.

### C.  Scope of Search

The Defendant argues that the troopers exceeded the scope of the Defendant's consent.  The Fourth Amendment to the United States Constitution protects an individual's right to be free from unreasonable searches and seizures.  *United States v. Susini*, 261 Fed.Appx. 270, 273 (11th Cir. 2008) (citing *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)).  However, searches done pursuant to consent have been held to be reasonable.  *Id.*  One limitation with consent searches is that the scope of the search is limited to the terms of the consent. *Id.* (citing *United States v. Rackley*, 742 F.2d 1266, 1270-71 (11th Cir. 1984)).  Trooper Heinlein testified that the Defendant agreed to the search of the vehicle, the passenger agreed to the search of the duffle bags, and that Defendant specifically agreed to the search of the black box.  The search was for illegal drugs, weapons, and U.S. currency which can be stored in small containers inside of a vehicle.  There was no evidence that the Defendant ever limited the scope of the search.  Further, Trooper Heinlein testified that the latches on the black box opened easily and he did not force them.  The Court finds that the troopers did not exceed the scope of the consent given to them by the Defendant and by the passenger.

### D.  Probable Cause to Arrest

The Defendant argues that Trooper Heinlein did not have probable cause to arrest him arguing that Trooper Heinlein did not know that the Defendant was a convicted felon. "Probable cause to arrest exists when the totality of the facts and circumstances support 'a reasonable belief that the suspect had committed or was committing a crime.'" *United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007) (citing *United States v. Gordon*, 231 F.3d 750,758 (11th Cir. 2000)). The testimony contradicts the Defendant's assertions. Trooper Heinlein and Trooper Adkinson testified that dispatch informed them from the records check that the Defendant had a lengthy criminal history including felony convictions. Therefore, when Trooper Heinlein found the weapon in the Defendant's vehicle and the Defendant stated that the weapon was his, Trooper Heinlein had probable cause to arrest the Defendant as a felon in possession of a firearm.

### E.  Promises by the Troopers

The Defendant argues that the troopers made promises to him that if he cooperated, he would be released. To show that a suspect voluntarily made statements, the government must show that the statements were "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *United States v. Graham*, 323 Fed. Appx. 793, 799 (11th Cir, 2009). The uncontroverted testimony of the troopers contradicts the Defendant's argument. Troopers Heinlein, Adkinson and Grider testified that they made no promises to the Defendant. Trooper Heinlein told the Defendant that the determination of whether he would be released was not his decision to make. The Court finds no evidence that any of the troopers made any promises to the Defendant, and specifically,  no

promise that if the Defendant cooperated, he would be released.  The Court finds that the Defendant's statements made after his *Miranda*[2] warnings were given were voluntary.

### F.  Question as to Ownership of Weapon

The Defendant argues that Trooper Heinlein's question regarding who owned the firearm found in the black box in the trunk violated the Defendant's constitutional rights.  A defendant's statement while the defendant is in custody may only be introduced into evidence if the defendant was given his *Miranda* rights prior to the interrogation.  *United States v. Gomes*, 279 Fed.Appx. 861, 868 (11th Cir. 2008).  Before *Miranda* warnings are required, a defendant must be in custody and under interrogation.  *Id*. (citing *United States v. Castro,* 723 F.2d 1527, 1530 (11th Cir. 1984) (per curiam)). "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (citing *California v. Behler*, 463 U.S. 1121, 1125 (1983)).  The Court must consider the totality of the circumstances surrounding the interrogation and whether a reasonable man in the suspect's position would feel that "'a restraint on his freedom of movement to such extent that he would not feel free to leave.'" *Id*. (citing *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001)).   The test is an objective one from the prospective of a reasonable innocent person, and therefore the beliefs of the defendant and the agents are not relevant. *Id*. (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)).  "Generally, a person temporarily detained pursuant to an ordinary traffic stop is not 'in custody' for the purposes of Miranda.." *United States v. Crawford*, 294 Fed.Appx. 466, 473 (11th Cir. 2008), (quoting *Berkemer*

---

[2]  *Miranda v. Arizona*, 384 U.S. 436 (1966).

*v. McCarty*, 468 U.S. 420, 440 (1984)).  An officer may ask a "moderate number of questions" relating to a person's identity and to dispel the officer's suspicions, however, a detainee is not required to respond. *Berkemer v. McCarty*, 468 U.S. at 439.  "The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda."  *Id.* at 440.

The Court must determine if the Defendant in the instant case was in custody at the time the question of ownership of the gun was asked by Trooper Heinlein. Generally, a person is not considered in custody during a traffic stop. The Defendant was in possession of his identification papers.  He voluntarily had given consent to have Trooper Heinlein search his vehicle.  Therefore, the Defendant's detention was consensual as long as the scope of the search did not exceed the consent.  *United States v. Gonzalez*, 275 Fed.Appx. 930, 933 (11th Cir. 2008) (quoting *Purcell*, 236 F.3d at 1279 n. 8).  There was no evidence presented that the scope of the search exceeded the consent in this case.  The Defendant gave consent to search the vehicle and gave consent to search the black box. The Court must also look to the totality of the circumstances surrounding the interrogation and view the incident from the prospective of a "reasonable innocent person" and not from the prospective of the Defendant or the troopers.  Although the troopers knew that the Defendant was a convicted felon, the issue is not from their prospective but rather from the prospective of a reasonable innocent person.  From the prospective of a reasonable innocent person, the question of the ownership of the gun would not cause an innocent person to believe that he was not free to leave the scene.  Even a reasonable innocent person might have felt compelled to answer the question, but an innocent person would not have felt that he was restrained to the point that he was not free to leave.

If the District Court determines that the Defendant was in custody at the time of the question of the ownership of the gun, then the issue becomes what statements and evidence should be suppressed.  The gun was found prior to the question, therefore the gun is not subject to suppression. *"Miranda* forbids the prosecution from using statements made by a defendant during a custodial interrogation unless the defendant had first been advised of her constitutional rights." *United States v. Paskett*, 950 F.2d 705, 707 (11th Cir. 1992).  *Miranda* only applies when a suspect is in custody and is subject to express questioning or its functional equivalent. *United States v. Young*, 377 Fed. Appx. 965, 968 (11th Cir. 2010) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)).  The functional equivalent of questioning refers to when an officer uses words or actions which the officer should know will reasonably elicit an incriminating response from a suspect.  *Id*. at 968-69 (citing *Rhode Island v. Innis*, 446 U.S. 291, 301-03 (1980)).

"'Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [the holding in *Miranda*].'"  *Id*. at 969 (quoting *Miranda*, 384 U.S. at 478).    Spontaneous statements that are not the product of interrogation do not violation *Miranda*. *United States v. Villegas-Tello*, 319 Fed.Appx. 871, 876 (11th Cir. 2009).  Further, it is immaterial whether the voluntary statements and spontaneous comments were made before or after *Miranda* rights were given. *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir, 1991).

If it is determined that the Defendant was in custody, then the statement made by him in response to the question of ownership of the gun was that the gun was not his and would be suppressible.  Only the statement of lack of ownership would be suppressed.  The next statements made by the Defendant that were not in response to any questioning by the troopers and would be admissible as spontaneous statements.  Trooper Heinlein separated the passenger from the Defendant

-17-

and asked her questions.  The Defendant called to Trooper Heinlein and began making voluntary, spontaneous statements.  Trooper Heinlein stopped the Defendant and read him his *Miranda* rights, and again the Defendant made voluntary statements which were not elicited from questioning by the troopers.  These statements are admissible as voluntary and spontaneous statements.

Even if the Defendant's statement about the ownership of the gun is suppressed, the subsequent statements after he received his warnings are admissible due to the giving of the *Miranda* warnings.  "The 'subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statements ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.'"  *United States v. Sagoes*, 2010 WL 2911230, *3 (11th Cir. July 27, 2010) (quoting *United States v. Gonzalez-Lauzan*, 437 F.3d 1132 n.4 (11th Cir. 2006) and citing *Oregon v. Elstad*, 470 U.S. 298, 314 (1985)).  There was no evidence that the question asked about the ownership of the gun prior to any *Miranda* warnings being given was used as a ploy to have the Defendant make statements after the warnings were given.  *See, United States v. Sagoes*, 2010 WL 2911230 *3 (11th Cir. July 27, 2010).  Therefore, even if the prior statement of the Defendant that the gun was not his is suppressible, any statements made by the Defendant after *Miranda* warning were given should not be suppressed as either voluntarily given or cured by the *Miranda* warnings.

## III.  Conclusion

The Court finds that traffic stop, search, arrest of the defendant, and questioning by the troopers were lawful, and that the evidence seized and the statements made by the Defendant should not be suppressed.  It is further recommended that the Motion to Suppress Evidence and Statements Obtained from an Illegal Search and Seizures (Doc. 24) be denied.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this ___27th___ day of October, 2010.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record